James C. Shah (SBN 260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN 279834)
Email: kctang@millershah.com
**MILLER SHAH LLP**
8730 Wilshire Blvd., Suite 400
Los Angeles, California 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

Christopher E. Roberts (phv forthcoming)
Email: CRoberts@butschroberts.com
BUTSCH ROBERTS & ASSOCIATES LLC
7777 Bonhomme Avenue, Suite 1300
Clayton, Missouri 63105
Telephone: (314) 863-5700

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| GBEMISOLA ADAMS, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UNICE, INC.,<br><br>Defendant. | Case No.: 2:25-cv-04273<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

# CLASS ACTION COMPLAINT

COME NOW Plaintiff, Gbemisola Adams ("Plaintiff" or "Adams"), individually, and on behalf of all others similarly situated, through her undersigned counsel, and for her Class Action Complaint against Defendant, UNice, Inc. ("Defendant"), states:

## INTRODUCTION AND BACKGROUND ON THE TCPA

1. Plaintiff brings this case to protect her privacy rights; namely, the right to be left alone from unwanted telemarketing communications.

2. Plaintiff brings this suit in an effort to stop companies like Defendant from sending text messages to her and the putative class (defined below) members' phones despite the fact that Plaintiff and the putative class members expressly requested Defendant stop sending them text messages, and Defendant expressly promised to stop sending text messages to Plaintiff and the putative class members.

3. When companies, like Defendant, receive a request to stop sending text messages to a recipient of such messages, such companies have an obligation to place the person making the stop request on the company's internal do-not-call list, and to no longer send text messages to the person.

4. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the Telephone Consumer Protection Act ("TCPA") into law, to protect consumers' privacy rights; namely, the right to be left alone from unwanted telemarketing communications. A leading sponsor of the TCPA described unwanted telemarketing communications as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

5. The TCPA affords special protections for people who request to be placed on a company's internal do not call list. Specifically, the TCPA provides that each person who receives more than one call on their cell phone after requesting to be placed on the company's internal do not call list is entitled to recover a penalty of

$500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. 47 U.S.C. § 227(c)(5).

6. The problem with receiving unwanted telemarketing communications is a problem that most people in this country, like Adams, frequently face. For example, in 2024 alone, approximately 52.8 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited January 15, 2025).

7. Decades after the TCPA passed into law, it is still unfortunately the case that "month after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

8. In fact, in 2023 alone, there were more than two million do-not-call complaints to the FTC about unwanted telemarketing calls. Federal Trade Commission ("FTC"), *FTC Issues Biennial Report to Congress on the National Do Not Call Registry* (Jan. 8, 2024) *available at*: https://www.ftc.gov/news-events/news/press-releases/2024/01/ftc-issues-biennial-report-congress-national-do-not-call-registry (last visited October 4, 2024).

9. The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission ("FCC") levied more than $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this Court original jurisdiction of all

civil actions arising under the laws of the United States.

11. This Court has personal jurisdiction over Defendant because it transacts business in California, directly markets its products and services in California, and sells various products and services in California, and for the reasons otherwise set forth in this Complaint.

12. This Court has personal jurisdiction over Defendant because it is a California corporation with its principal place of business in Carson, California.

13. Defendant has continuous and systematic contacts with the State of California.

14. Adams was (and is) a resident and citizen of the State of Georgia at all times relevant to this Complaint.

15. Venue is proper under 28 U.S.C. §§ 1391(b)(2) as a substantial portion of the events giving rise to the claims herein arose in this District and the harms of Defendant's actions were sustained in this venue.

## PARTIES

16. At all times relevant to this Complaint, Adams was, and is still, the owner of a cell phone, with a phone number of 470-XXX-0231.

17. The monthly bill associated with Adams's phone number is issued in her name, and not in the name of a business.

18. Adams uses her cell phone primarily for personal purposes, such as communicating with friends and family members.

19. Defendant UNice, Inc. is a California corporation with its principal place of business in the State of California. Defendant has at all times relevant to this Complaint been in good standing to transact business in the State of California, and throughout the United States.

20. Defendant's business is selling a variety of human hair products, including, but not limited to, wigs and extensions.

21. Defendant has an online business and brick-and-mortar locations in

which it sells its products.

22. Defendant's filings with the California Secretary of State identify Defendant's mailing address, principal office of corporation and the address of its registered agent as 20220 Avalon Boulevard, A, in Carson, California.

23. Defendant's physical location in Carson, California identifies Defendant's Facebook handle as "UNiceMall" and its Instagram handle as "UNiceHair."

24. Defendant's location in Carson, California includes signage with Defendant's logo and other signs advertising "extensions" and "100% Human Virgin Hair."

25. Defendant's filings with the California Secretary of State indicate that Defendant's "Type of Business" is "Retail Store."

26. Defendant's website is www.unice.com.

27. Defendant's website sells a variety of human hair products, including, but not limited to, wigs and extensions.

28. Defendant's website also includes a page that provides information about one of its physical store locations in Inglewood, California.

29. Defendant's website also includes a page that provides information about one of its physical store locations in Carson, California.

30. Defendant's website also provides links to Defendant's Instagram and Facebook pages. The Instagram link goes to an Instagram page with a handle of "UNiceHair." The Facebook link goes to a Facebook page with a handle of "UNiceMall."

31. Defendant markets its products, in part, by sending text messages that advertise its products.

**DEFENDANT'S TEXT MESSAGES TO PLAINTIFF**

32. On August 18, 2024, Defendant sent a text message to Plaintiff stating: Whooo! This kinky wig is like your real hair, HALF price on

weekend sale! also send exclusive free gifts, Unice https://twsms.unice.com/6h80Jp/ STOP to opt out

33. Adams followed Defendant's instructions that same day and responded, "Stop."

34. Defendant then immediately responded to Adams's "stop" request by stating, "NETWORK MSG: You replied with the word "stop" which blocks all texts from this number. Text back "unstop" or "start" to receive messages again.

35. Despite Adams's request to no longer receive text messages from Defendant and despite Defendant's promise to no longer send Adams text messages, Defendant continued to send text messages to Adams.

36. On August 19, 2024, Defendant sent Adams a text message stating:

UNice: Hi Sis, Hair You're Eyeing On Just Dropped Up to 70% off, get it now: https://st.unice.com/XePUw6/8511 STOP to opt out

37. On August 20, 2024, Defendant sent Adams a text message stating:

UNice: The product you viewed is on sale. Save up to $200 off with code: V200, grab the newest trending now: https://st.unice.com/ltLKqE/7d44 to stop to opt out

38. On August 22, 2024, Defendant sent Adams a text message stating:

UNice: You're on the way to hottest list. Use code: V200 to save up to $200 off to get it: https://st.unice.com/3TAkh1/49e8 STOP to opt out

39. On August 23, 2024, Defendant sent Adams a text message stating:

<UNice> Great News! U got chance (sic) to earn (sic) FREE WIG by submitting a review video, view more https://st.unice.com/FVKkst or email support@unice.com stop to opt out

40. On August 24, 2024, Defendant sent Adams a text message stating:

UNice: Recommendation from Shesyourfave, use code: V200 to save up to $200 off to get your new year style: https://st.unice.com/nRtY5b/d237 STOP to opt out

41. Adams again followed Defendant's instructions, and that same day

responded, "Stop."

42. Defendant then immediately responded to Adams's "stop" request by again stating, "NETWORK MSG: You replied with the word "stop" which blocks all texts from this number. Text back "unstop" or "start" to receive messages again.

43. Despite Adams's two requests to no longer receive text messages from Defendant and despite Defendant's two promises to no longer send Adams text messages, Defendant continued to send text messages to Adams.

44. On September 4, 2024, Defendant sent Adams a text message stating:

This wig was mindful of our forehead, the size, just throw on & go, veru (sic) flat/thin lace. $32 by afterpay, unice: https://unicecom.smsb.co/eXUFXC STOP to opt out.

45. On February 13, 2025, Defendant sent Adams a text message stating:

this wig wins more compliments when out. Keep your comfort/outstanding all day. Flash sale $89, unice https://unicecomsmsb.co/AorAKD STOP to opt out

46. On February 13, 2025, Defendant sent Adams a text message stating:

This wig is soooo versatile, Was $330 Now $99, True 13x4 ear to ear Glueless wig, Don't miss, unice: https://unicecom.smsb.co/WhZaB7 STOP to opt out

47. After the date of Adams's initial stop request she did not provide any form of consent to receive additional text messages from Defendant.

48. On information and belief, upon clicking the vast majority of each of the links in the post-stop text messages sent by Defendant, the person clicking the link is directed to Defendant's website.

49. Adams seeks recovery individually, and on behalf of the putative class members, for the post-stop text messages Defendant sent to Adams and the putative class members. Adams does not seek recovery for the text messages sent by Defendant that confirmed Adams and the putative class members would no longer be sent text messages.

## NUMEROUS CONSUMERS COMPLAIN ABOUT DEFENDANT'S INCESSANT POST-STOP TEXT MESSAGES

50. Numerous consumers, like Adams, have complained about Defendant continuing to send incessant text message solicitations after requesting to no longer receive such messages from Defendant.

51. One consumer complained, "Ya'll I cannot get this place to leave me alone!! I've unsubscribed from their text messages and these mofos started texting me from other phone numbers. I bought my first ever lace front wig from them and it's HARASSMENT ever since."

52. Another consumer complained, "They will not stop texting me offers and coupons even though I (sic) told them to stop. I have not yet purchased one of their wigs and I never will. They need to stop contacting me."

53. Another consumer complained, "I purchased from this company and have been harassed ever since I have hit stop or reported spam on the text message marketing at least 20 times and they continue to text me from different numbers. It's so frustrating. I paid for product and it shows no appreciation for customers to not respect their (sic) requests to stop text messaging. I will never use them again."

54. In addition, Defendant and/or its related companies have been sued on multiple prior occasions for continuing to text consumers after they requested to stop receiving such text messages.

## DIRECT AND VICARIOUS LIABILITY

55. Without the benefit of discovery, and because Defendant disclosed its identity in the text messages at issue, Adams assumes Defendant directly sent the text messages at issue.

56. However, if some or all the text messages were made by third-party/parties on behalf of Defendant, in the alternative, Defendant is vicariously liable for those text messages.

57. On May 9, 2013, the FCC determined that telemarketers like Defendant

could not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

58. Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id*. at 6587 n. 107.

59. The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593.

60. If Defendant directly sent the text messages at issue to Adams and the putative class members, Defendant is directly liable for the sending of those text messages.

61. However, Defendant may have hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third-party telemarketers.

62. If Defendant did not directly send the text messages to Adams and the putative class members, Defendant's third-party telemarketers had actual and/or apparent authority to act on behalf of Defendant.

63. Likewise, Defendant also ratified its agents' violations of the TCPA by accepting sales from unlawful telemarketing communications.

64. Defendant controlled or had the right to control the marketing activities of those acting on its behalf.

65. Defendant acted as principals to telemarketing agent(s) who were acting on their behalf.

66. Defendant is not permitted under the law to outsource and contract their way out of liability by directing and benefitting from their captive agents' TCPA violations.

67. For the count identified below, if Defendant directly sent the text messages and/or calls at issue to Adams and the putative class members, it is directly liable. Alternatively, to the extent any text messages were sent/placed by a third-party agent(s) acting on Defendant's behalf, Defendant is vicariously liable for those unlawful communications.

## CLASS ALLEGATIONS

68. Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this lawsuit as a class action on behalf of herself and all others similarly situated. This action satisfies the requirements of Rule 23.

69. Adams seeks to represent the following class (the "Class"):

> All persons in the United States from four years prior to the filing of this action through class certification to whom: (1) Defendant sent text messages marketing its products or services, (2) Defendant placed more than one text message and/or phone call to the person in a twelve-month period, and, (3) Defendant sent such text messages after the person requested that Defendant stop sending them text messages.

70. Adams reserves the right to add administrative subclasses, or to amend

the definition of the proposed Class, as this lawsuit proceeds.

71. The members of the proposed Class are so numerous that joinder of all members is impracticable. Adams reasonably believes that hundreds or thousands of people have been harmed by Defendant's actions. The phone numbers of the members of the proposed Class are readily identifiable through records available to Defendant or those acting on their behalf.

72. Most members of the proposed Class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

73. On information and belief, Defendant has texted, and continue to text, people whose numbers should have been placed on Defendant's internal do-not-call list. It is reasonable to expect that Defendant will continue to place such text messages, absent this lawsuit.

74. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed Class include, but are not limited to:

   a. Whether Defendant's conduct of placing text messages to persons who requested to no longer receive text messages from Defendant violates 47 U.S.C. § 227(c) and/or the TCPA's corresponding regulations;

   b. Whether the text messages were "solicitations," as defined by the TCPA;

   c. Whether Defendant's conduct violates the rules and regulations implementing the TCPA; and

   d. Whether Adams and the putative Class members are entitled to increased damages for each violation based on the willfulness of Defendant's conduct.

75. Adams's claims are typical of the claims of the proposed Class members because her claims arise from the same practice that gives rise to the claims of the members of the proposed Class and are based on the same legal theories.

76.     Adams and her counsel will fairly and adequately protect the interests of the members of the proposed Class. Adams's interests do not conflict with the interests of the proposed Class she seeks to represent, and she has retained lawyers who are competent and experienced in class action litigation, TCPA litigation and consumer law.

77.     Adams's counsel will vigorously litigate this case as a class action.

78.     A class action is superior to all individual lawsuits for this controversy. Joinder of all proposed members of the proposed Class in one action is impracticable, if not impossible, and prosecuting hundreds or thousands of individual actions is not feasible. The size of individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most members of the proposed Class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed Class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

79.     In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

80.     Questions of law and fact, particularly the propriety of placing text messages to persons after such persons requested to no longer receive text messages (and after Defendant promised to stop sending such text messages), predominate over questions affecting only individual members.

81.     Defendant has acted or refused to act on grounds that apply generally to the Class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

# COUNT I
## Violations of the Telephone Consumer Protection Act
### 47 U.S.C. § 227(c), *et seq.* (Internal Do-Not-Call List Violations)

82. Adams incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

83. The TCPA provides that "a person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" may recover $500 for each violation, and up to $1,500 for each violation, if the violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

84. The regulations prescribed under Section 227(c) require companies like Defendant, who engage in sending telephone solicitation text messages to institute and effectively implement "procedures for maintaining a list of persons who request not to receive telemarketing calls on or behalf of that person or entity." *See* 47 C.F.R. § 64.1200(d).

85. These procedures must meet several minimum standards, including, but not limited to:

(1) ***Written policy.*** Persons or entities making artificial or prerecorded-voice telephone calls pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) ***Training of personnel.*** Personnel engaged in making artificial or prerecorded-voice telephone calls pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or who are engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) ***Recording, disclosure of do-not-call requests.*** If a person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity,

the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed ten (10) business days from the receipt of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will be liable for any failures to honor the do-not-call request. A person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) or any call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a call is made or an affiliated entity.

(4) *Identification of callers and telemarketers.* A person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) *Affiliated persons or entities.* In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and (for telemarketing calls) the product being advertised.

(6) *Maintenance of do-not-call lists.* A person or entity making artificial or prerecorded-voice telephone calls pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes must maintain a record of a consumer's request not to receive further calls. A do-not-call request must be honored for 5 years from the time the request is made.

*See* 47 C.F.R. § 64.1200(d)(1)-(6).

86.     Defendant failed to maintain and/or effectively implement these minimum standards by repeatedly sending text messages to Adams and the putative

class members after Adams and the putative class members requested that Defendant stop sending them text messages, and Defendant repeatedly promised to abide by such requests.

87. In addition, the TCPA allows the Court to enjoin Defendant from sending text messages to phone numbers that should have been placed on Defendant's internal do-not-call list. *See* 47 U.S.C. §§ 227(c)(5)(A).

88. By sending text messages to the cell phones of Adams and the putative class members after their numbers should have been placed on Defendant's internal do not call list, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. § 227(c) and the TCPA's corresponding regulations.

89. Defendant knew or should have known that Adams and the putative class members did not wish to receive text messages as such persons expressly advised Defendant that they did not wish to receive text messages from Defendant, and Defendant promised it would no longer send such messages.

90. Adams and the putative class members are entitled to damages of $500.00 per violation for each text message sent by Defendant in violation of the TCPA and up to $1,500.00 per violation if the Court finds that Defendant willfully violated the TCPA.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff Gbemisola Adams, individually, and on behalf of all others similarly situated, requests that the Court:

a. Enter an order pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying the proposed Class, appointing Adams as the Class representative, and appointing her counsel as class counsel;

b. Enter judgment against Defendant and in favor of Adams and the Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief, statutory damages of up to $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

CLASS ACTION COMPLAINT         - 14 -

  c. Enter a judgment in favor of Adams and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

  d. Enter judgment in favor of Adams and the Class for all applicable pre-judgment and post-judgment interest amounts;

  e. Enter judgment in favor of Adams and the Class for all costs, including the cost of class notice; and

  f. Award Adams and the Class members such further and other relief the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Please take notice that Plaintiff demands a jury trial.

| | |
|---|---|
| Dated: May 12, 2025 | Respectfully submitted, |
| | MILLER SHAH LLP |
| | */s/James C. Shah* |
| | James C. Shah (SBN 260435) |
| | Email: jcshah@millershah.com |
| | Kolin C. Tang (SBN 279834) |
| | Email: kctang@millershah.com |
| | 8730 Wilshire Blvd., Suite 400 |
| | Los Angeles, CA 90211 |
| | Telephone: (866) 540-5505 |
| | Facsimile: (866) 300-7367 |
| | |
| | BUTSCH ROBERTS & ASSOCIATES LLC |
| | |
| | */s/Christopher E. Roberts* |
| | Christopher E. Roberts (phv forthcoming) |
| | Email: CRoberts@butschroberts.com |
| | 7777 Bonhomme Avenue, Suite 1300 |
| | Clayton, Missouri 63105 |
| | Telephone: (314) 863-5700 |
| | |
| | *Attorneys for Plaintiff* |